## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JLL CONSULTANTS, INC., TRUSTEE OF BUFFETS HOLDINGS, INC. ET AL. LITIGATION TRUST, §§§§ | Case No. _10·1195 ADM / JSM_ |
| Plaintiff, §§§ | |
| v. §§ | |
| CAXTON-ISEMAN CAPITAL, INC., CAXTON-ISEMAN INVESTMENTS, L.P., CAXTON ASSOCIATES LP F/K/A CAXTON ASSOCIATES, L.L.C. F/K/A CAXTON CORPORATION, CxCIC, LLC, CI CAPITAL PARTNERS, LLC f/k/a CAXTON-ISEMAN CAPITAL, LLC, FREDERICK J. ISEMAN, SENTINEL CAPITAL PARTNERS, L.L.C., SENTINEL CAPITAL PARTNERS II, L.P., AND ROE H. HATLEN, §§§§§§§§§§§§§§§§§ | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Defendants. § | |

As and for its Complaint against defendants Caxton-Iseman Capital, Inc., Caxton-Iseman Investments, L.P., Caxton Associates LP f/k/a Caxton Associates, L.L.C. f/k/a Caxton Corporation, CxCIC, LLC, CI Capital Partners, LLC f/k/a Caxton-Iseman Capital, LLC, Frederick J. Iseman, Sentinel Capital Partners, L.L.C., Sentinel Capital Partners II, L.P., and Roe H. Hatlen, (collectively, "Defendants"), plaintiff JLL Consultants, Inc., Trustee of the Buffets Holdings, Inc. et al. Litigation Trust, states and alleges as follows:

SCANNED
APR 8 2010
U.S. DISTRICT COURT MPLS

# I.
# PARTIES

1.     JLL Consultants, Inc. is the Trustee of the Buffets Holdings, Inc. et al. Litigation Trust ("Buffets Litigation Trust") created pursuant to the Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of Buffets Restaurant Holdings, Inc. and its subsidiaries (collectively, "Buffets"), each of which filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on January 22, 2008.[1] Buffets Litigation Trust is the assignee of claims against Defendants that were previously held by Buffets.

2.     Caxton-Iseman Capital, Inc. is incorporated under the laws of the state of Delaware.  Its principal place of business is 500 Park Avenue, New York, New York 10022.  Caxton-Iseman Capital, Inc. was party to a management and fee agreement with one of the debtors, Buffets, Inc.

3.     Caxton-Iseman Investments, L.P. is a limited partnership organized under the laws of the state of Delaware.  Its principal place of business is 500 Park Avenue, New York, New York 10022.   Caxton-Iseman Investments, L.P. was a majority

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Buffets Restaurants Holdings, Inc. (9569), Buffets Holdings, Inc. (4018), Buffets, Inc. (2294), HomeTown Buffet, Inc. (3002), OCB Restaurant Company, LLC (7607), OCB Purchasing Co. (7610), Buffets Leasing Company, LLC (8138), Ryan's Restaurant Group, Inc. (7895), Buffets Franchise Holdings, LLC (8759), Tahoe Joe's, Inc. (7129), HomeTown Leasing Company, LLC (8142), OCB Leasing Company, LLC (8147), Big R Procurement Company, LLC (5198), Ryan's Restaurant Leasing Company, LLC (7405), Fire Mountain Restaurants, LLC (8003), Ryan's Restaurant Management Group, LLC (6739), Tahoe Joe's Leasing Company, LLC (8145), Fire Mountain Leasing Company, LLC (7452), and Fire Mountain Management Group, LLC (7299).  The address and principal place of business for all of the Debtors is 1460 Buffet Way, Eagan, MN 55121.

1576373v1

shareholder of Buffets Holdings, Inc. and Buffets Restaurant Holdings, Inc., both of which ultimately owned Buffets, Inc. and its subsidiaries.

4.      Caxton Associates LP f/k/a Caxton Associates, L.L.C. f/k/a Caxton Corporation ("Caxton") is a limited partnership organized under the laws of the state of Delaware.  Its principal place of business is 731 Alexander Road, Building 2, Princeton, New Jersey 08540.  Caxton, along with Frederick J. Iseman, was a founding partner of Caxton-Iseman Capital, Inc. and CI Capital Partners, LLC f/k/a Caxton-Iseman Capital, LLC.  According to its press releases, Caxton spun-off CI Capital Partners, LLC f/k/a Caxton-Iseman Capital, LLC, in 2007.

5.      CxCIC, LLC ("CxCIC") is a limited liability company organized under the laws of the state of Delaware.  Its principal place of business is 500 Park Avenue, New York, New York 10022.  CxCIC was party to a management and fee agreement with Buffets, Inc.

6.      CI Capital Partners, LLC f/k/a Caxton-Iseman Capital, LLC ("CI Capital Partners") is a limited liability company organized under the laws of the state of Delaware.  Its principal place of business is 500 Park Avenue, New York, New York 10022. CI Capital Partners LLC is listed as the contact for Caxton-Iseman Investments, L.P. and CxCIC and, on information and belief, CI Capital Partners controls Caxton-Iseman Investments, L.P. and CxCIC.

7.      Caxton-Iseman Capital, Inc., Caxton-Iseman Investments, L.P., Caxton, CxCIC, and CI Capital Partners are affiliated entities and are sometimes referred to in this Complaint collectively as "Caxton-Iseman."

-3-

8.     Frederick J. Iseman ("Iseman") resides at 500 Park Avenue, Floor 8, New York, New York 10022.  Iseman was a founding partner of the Caxton-Iseman entities, and upon information and belief, he exercises control over each of these entities.

9.     Sentinel Capital Partners, L.L.C. ("Sentinel LLC") is a limited liability company organized under the laws of the state of Delaware.  Its principal place of business is 330 Madison Avenue, 27th Floor, New York, New York 10017.  Sentinel LLC was party to a management and fee agreement with Buffets, Inc.

10.     Sentinel Capital Partners II, L.P. ("Sentinel LP") is a limited partnership organized under the laws of the state of Delaware.  Its principal place of business is 330 Madison Avenue, 27th Floor, New York, New York 10017.  Sentinel LP was a minority shareholder in Buffets Holdings, Inc. and Buffets Restaurant Holdings, Inc., both of which ultimately owned Buffets, Inc. and its subsidiaries..

11.     Sentinel LLC and Sentinel LP are affiliated entities and are sometimes referred to in this Complaint collectively as "Sentinel."

12.     Roe H. Hatlen ("Hatlen") resides at 13141 Hannover Court, Apple Valley, Minnesota 55124.  Hatlen was a minority shareholder of Buffets Holdings, Inc. and Buffets Restaurant Holdings, Inc., both of which ultimately owned Buffets, Inc. and its subsidiaries.  Hatlen was party to a fee agreement with Buffets Holdings, Inc. and Buffets, Inc.

-4-

## II.
## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331,

1334, and 1367.  The defendants are each subject to personal jurisdiction in Minnesota

because they have sufficient minimum contacts with Minnesota and because these claims

arise out of their activities in Minnesota.  Venue is proper in this Court pursuant to 28

U.S.C. §§ 1391 and 1409.

## III.
## FACTUAL BACKGROUND

14.     Buffets is based, and has always been based, in Eagan, Minnesota.  Buffets,

Inc. and most of its subsidiaries are incorporated in Minnesota.[2]  Buffets is one of the

nation's largest steak-buffet restaurant chains.  Prior to bankruptcy, it operated more than

600 restaurants in 42 states and employed over 36,000 people.

15.     Buffets, Inc. was founded in 1983 and completed its initial public offering

in 1985.  It was purchased by Caxton-Iseman Investments, L.P. and Sentinel LP on

October 2, 2000.  Buffets filed for bankruptcy on January 22, 2008.

16.     After filing bankruptcy, Buffets did not have sufficient assets to satisfy the

claims of its creditors.  Buffets and its creditors entered into a Third Amended Joint Plan

of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"), which the

Court subsequently confirmed.  Under the Plan, Buffets assigned its claims against

---

[2] Buffets Restaurants Holdings, Inc. and Buffets Holdings, Inc., the two holding companies that directly or indirectly owned Buffets, Inc. and its subsidiaries, are incorporated in Delaware.  A few of Buffets, Inc.'s subsidiaries are incorporated in either Delaware or South Carolina.

1576373v1

Defendants to Buffets Litigation Trust. These claims include, but are not limited to, "claims in respect of fees, dividends, compensation, or other distributions" received by Defendants prior to the bankruptcy filing.

17.    The beneficiaries of Buffets Litigation Trust include Buffets' senior note holders and general unsecured creditors. Under the Plan, these two classes of creditors were estimated to recover less than five percent of the amounts owed to them.

**Buffets' Financial Condition Before Caxton-Iseman and Sentinel**

18.    In 1999, the year before the Caxton-Iseman/Sentinel buyout, Buffets, Inc. had "record sales and earnings." According to Buffets, as compared to the previous year, earnings per share increased 14.5% and net earnings increased 7.9% to $42,400,000. Hatlen, then CEO of Buffets, Inc., announced that "[o]ur operational and financial strengths continue to put us in an enviable position to leverage our opportunities in the coming year." Buffets, Inc.'s long-term debt was $41,465,000 and stockholder equity was reported to be $306,383,000.

19.    The first quarter of 2000 was, according to Buffets, the "most profitable quarter in the history of the Company." Hatlen described Buffets as having a "robust financial position." Buffets, Inc. reported an increase in stockholder equity to $319,758,000.

20.    The second quarter of 2000, the last quarter before the Caxton-Iseman/Sentinel buyout, was again announced as the most profitable quarter in Buffets Inc.'s history. According to Buffets, as compared to the comparable quarter in 1999,

earnings per share increased 18.5% and net earnings increased 16%. Buffets, Inc.'s long-term debt remained even, and stockholder equity increased to $334,289,000.

**Caxton-Iseman and Sentinel Purchase Buffets**

21.     In June 2000, Caxton-Iseman and Sentinel announced a definitive agreement to buy Buffets, Inc. for $643 million. The leveraged buyout, which was described as a merger, was the first of several transactions orchestrated by Defendants that drained cash out of Buffets while burdening it with significant long-term debt and lease obligations.

22.     According to a proxy statement filed with the United States Securities and Exchange Commission (the "SEC") on August 22, 2000, Buffets used $665.2 million in the buyout transaction for these purposes: (1) payment of merger consideration ($592 million), (2) repayment and/or funding of existing indebtedness and other obligations ($49.2 million), and (3) payment of merger fees and expenses ($24 million). The sources of funding were: (1) $130 million paid by Caxton-Iseman, Sentinel and certain members of Buffets' management, including Hatlen, (2) $80 million from the issuance of 14% senior subordinated notes, (3) $15 million from the issuance of 16% senior subordinated notes, (4) a $310 million senior secured term loan and a $30 million senior secured revolving credit facility, (5) approximately $20 million from a sale and leaseback transaction in which Defendants sold Buffets' headquarters in Eagan, Minnesota, and incurred significant long-term lease obligations, and (6) $110.2 million of available cash of Buffets. Caxton-Iseman and Sentinel formed a holding company known as Buffets Holdings, Inc. ("Buffets Holdings") that wholly-owned Buffets, Inc. and its subsidiaries.

-7-

1576373v1

23.    Of the $130 million paid by the new shareholders, Caxton-Iseman Investments, L.P. paid $111.5 million, Sentinel LP paid $10 million, and Hatlen paid $5 million.  Caxton-Iseman Capital, Inc., however, arranged a contract with Buffets, Inc. by which it received $6.43 million as "a transaction fee" for the buyout.

24.    Prior to the merger, Buffets, Inc. reported shareholder equity of $346,411,000.  After the merger, Buffets reported shareholder equity of $135,371,000.  One of the largest assets that Buffets listed on its balance sheet after the buyout, which resulted in the shareholder equity noted above, was recorded goodwill of $325,500,000.  Buffets acknowledged in the proxy statement that "[a]s a result of the completion of the merger ... Buffets will incur a significant amount of indebtedness."  The merger, however, was simply the beginning of Defendants' actions that enriched themselves while crippling Buffets with significant indebtedness that ultimately could not be repaid.

**Defendants' Management and Advisory Agreements with Buffets**

25.    After Defendants gained control of the company, Buffets immediately entered into a series of one-sided advisory agreements by which Defendants were paid exorbitant compensation for their services as "advisors."  Defendants' "advisory services" were not contracted for in good faith or at arm's length, were self-dealing, were harmful, were unnecessary, and provided no benefit or value to Buffets.  Through these agreements, Defendants withdrew an aggregate amount of at least $43,254,000 from Buffets from October 2000 until the end of Buffets' fiscal 2007.

A.    **Hatlen Fee Agreements**

26.    On September 28, 2000, four days before Caxton-Iseman and Sentinel consummated their purchase of Buffets, Hatlen entered into an advisory agreement with Buffets Holdings and Buffets, Inc. (the "Hatlen Fee Agreement"). While Hatlen's obligations under the Hatlen Fee Agreement were expressly limited to devoting no more than an equivalent of two days per calendar month, the Hatlen Fee Agreement assured him his full current salary in 2000 and a salary that ranged from $225,000 to $325,000 per year. Hatlen also received various fringe benefits (including office space, secretarial and staff support, health benefits, and automobile reimbursement) and stock incentives.

27.    On December 13, 2005, Buffets Holdings entered into an amendment to the Hatlen Fee Agreement under which Hatlen was to continue to provide advisory services (the "First Amended Hatlen Fee Agreement"). Under the First Amended Hatlen Fee Agreement, Hatlen received compensation at an annual rate of $200,000, together with potential incentive compensation payments and the fringe benefits provided under the Hatlen Fee Agreement.[3]

28.    On January 14, 2008, Buffets Holdings entered into a second amendment to the Hatlen Fee Agreement (the "Second Amended Hatlen Fee Agreement") under which Hatlen resigned as director and vice chairman of Buffets Restaurants Holdings, Inc. and

---

[3] Under the First Amended Hatlen Fee Agreement, Hatlen was also eligible for a lump sum cash bonus payment estimated to exceed $1 million in connection with certain major corporate events, as described more fully in the "Cash Bonus Schedule A" of the Side Agreement dated December 13, 2005 between Buffets Holdings, Inc. and Hatlen. At this time, it is unknown whether Hatlen received this payment.

all of its subsidiaries and affiliated companies. As explained below, Buffets Restaurants Holdings, Inc. was another holding company that Caxton-Iseman and Sentinel created in 2005; following its creation, Buffets Restaurants Holdings, Inc. wholly-owned Buffets Holdings and indirectly owned Buffets, Inc. and its subsidiaries.

29.     Under the Second Amended Hatlen Fee Agreement, Hatlen continued to provide "founder and advisory services" to Buffets. The Second Amended Hatlen Fee Agreement reaffirmed that Hatlen would not be required to devote more than the equivalent of two days per calendar month to providing advisory services. Hatlen's compensation under the Second Amended Hatlen Fee Agreement remained unchanged from the compensation set forth in the First Amended Hatlen Fee Agreement.

30.     According to Buffets' SEC filings discussing amounts paid under these agreements (which does not include dividends paid to Defendants), Hatlen received $325,000 in 2001, $150,000 in 2002, $283,000 in 2003, $257,000 in 2004, $238,000 in 2005, $243,000 in 2006, and $200,000 in 2007. Although not contemplated under any of the fee agreements, Hatlen also received $500,000 in connection with the merger with Ryan's Restaurant Group, Inc. ("Ryan's") in 2006. Hatlen received at least $2,196,000 in payments from October 2000 until the end of Buffets' fiscal 2007.

### B.     Caxton-Iseman Fee Agreements

31.     On October 2, 2000, the same day Caxton-Iseman completed the purchase of Buffets, Inc., Caxton-Iseman Capital, Inc. entered into a Management and Fee Agreement with Buffets, Inc. (the "Caxton-Iseman Fee Agreement"). The Caxton-Iseman Fee Agreement provided that, in return for providing "acquisition and financial

-10-

advisory services," Caxton-Iseman Capital, Inc. would receive (i) an advisory and management fee equal to two percent (2%) of Buffets, Inc.'s consolidated EBITDA (earnings before interest, taxes, depreciation, and amortization), (ii) a transaction fee of $6,430,000 upon completion of the Caxton-Iseman/Sentinel buyout of Buffets, Inc., and (iii) a 1% investment banking fee for any acquisitions, dispositions, sales, financings, or similar transactions.

32.     Particularly based on the fact that Buffets became highly leveraged as a result of Defendants' improper acts, basing the fee on Buffets, Inc.'s EBITDA (which does not take into account substantial interest owed on the debt incurred) inured to Caxton-Iseman's benefit and resulted in fees that were disproportionate to the actual results of Buffets.  As Buffets noted in an SEC filing: "[T]he use of EBITDA is limited because it does not include certain material costs, such as interest and taxes, necessary to operate our business.  EBITDA should be considered in addition to, and not as a substitute for, net income (loss) in accordance with GAAP as a measure of performance."

33.     On February 20, 2004, Buffets, Inc. executed an Amended and Restated Management and Fee Agreement (the "First Amended Caxton-Iseman Fee Agreement"). Although the original agreement was with Caxton-Iseman Capital, Inc., the amendment was entered into with CxCIC.  One of the principal motivations of the First Amended Caxton-Iseman Fee Agreement was to allow Caxton-Iseman (whichever Caxton-Iseman entity actually received the funds) to receive earlier access to the yearly advisory fee, which remained 2% of Buffets, Inc.'s consolidated EBITDA, based on a prepayment structure.   As under the original agreement, the First Amended Caxton-Iseman Fee

-11-

Agreement granted Caxton-Iseman a 1% "investment banking fee" for various transactions of Buffets.

34.     On November 1, 2006, the same day Buffets, Inc. consummated the Ryan's merger, Buffets, Inc. entered into a Second Amended and Restated Management and Fee Agreement (the "Second Amended Caxton-Iseman Fee Agreement"). Although the First Amended Caxton-Iseman Fee Agreement was with CxCIC, the Second Amended Caxton-Iseman Fee Agreement was entered into with Caxton-Iseman Capital, Inc., the party to the original fee agreement. In a further mixing of Caxton-Iseman entities, when Caxton-Iseman was asked to itemize its alleged activities related to the Ryan's merger, the letter came from CxCIC "c/o Caxton-Iseman Capital LLC." Of course, the letter was signed by Frederick Iseman, who exercises control over all of the Caxton-Iseman entities.

35.     Although any purported services in connection with the Ryan's merger would have occurred under the First Amended Caxton-Iseman Fee Agreement, the Second Amended Caxton-Iseman Fee Agreement retroactively increased the "transaction fee" for acquisitions to 2% and specifically provided that the fee for the Ryan's merger would be $16,800,000, twice the 1% fee that would have applied under the First Amended Caxton-Iseman Fee Agreement. This amendment, consummated at a time when Buffets was in financial distress with substantial indebtedness, is a particularly egregious example of Defendants' fraud and self-dealing to the detriment of Buffets and its creditors. The Second Amended Caxton-Iseman Fee Agreement provided the same

-12-

yearly advisory fee, including the prepayment structure instituted in the First Amended Caxton-Iseman Fee Agreement.[4]

36.    According to Buffets' SEC filings discussing amounts paid under these agreements (which does not include dividends paid to Defendants), Caxton-Iseman received $6.43 million in connection with its purchase of Buffets in 2000, an additional $400,000 in 2000, $2.9 million in 2001, $1.2 million in 2002, $2.8 million in 2003, $3.1 million in 2004, $1.8 million in 2005 and $300,000 in 2006.  In 2007, Caxton-Iseman received between $3.5 million and $5.7 million.  As discussed above, Caxton-Iseman also received $16.8 million in connection with the Ryan's merger in 2006.  Caxton-Iseman received at least $39.2 million in payments from October 2000 until the end of Buffets' fiscal 2007.

**C.    Sentinel Fee Agreement**

37.    On October 2, 2000, the same day Sentinel completed the purchase of Buffets, Inc., Sentinel LLC also entered into a Management and Fee Agreement with Buffets, Inc. (the "Sentinel Fee Agreement").  The Sentinel Fee Agreement provided that, in return for providing "acquisition and financial advisory services," Sentinel LLC would receive $200,000 annually.

38.    According to Buffets' SEC filings discussing amounts paid under this agreement (which does not include dividends paid to Defendants), Sentinel LLC received $50,000 in 2000, $200,000 in 2001, $108,000 in 2002 (2002 was a shorter fiscal year),

---

[4] The Second Amended Caxton-Iseman Fee Agreement also provided for 1% "transaction fees" for divestitures and business combinations.  At this time, it is unknown whether Caxton-Iseman collected additional transaction fees under these provisions.

$200,000 in 2003, $200,000 in 2004, $200,000 in 2005, $200,000 in 2006, and $200,000 in 2007. Although not contemplated under its fee agreement, Sentinel LLC also received $500,000 in connection with the Ryan's merger in 2006. Sentinel LLC received at least $1,858,000 in payments from October 2000 until the end of Buffets' fiscal 2007.

### D.   Defendants' "Services"

39.   Defendants did not provide services to Buffets that in any way justified the exorbitant amounts paid to them. Rather, these agreements were simply another way to extract money from Buffets. For example, in January 2006, Buffets announced that it planned to engage "financial advisors to assist in exploring various strategic alternatives to maximize shareholder value." Buffets later announced that it retained Credit Suisse Securities (USA) LLC and Piper Jaffray & Co. as financial advisors. When Buffets announced the Ryan's merger, it disclosed that "Buffets' financial advisor with respect to this transaction is Berenson & Company, LLC." Despite the involvement of at least three financial advisors during the time of the Ryan's merger (at considerable expense to Buffets), Defendants took $17,800,000 in payments for purported "financial advisory" services provided in connection with the Ryan's merger.

40.   When Defendants did provide any advice to Buffets, it was geared to enrich Defendants at the expense of Buffets. As explained more fully below, Defendants arranged multiple transactions that placed Buffets in an increasing amount of indebtedness to pay Defendants dividends far in excess of what they originally invested. They did this even while Buffets was insolvent according to its financial statements filed with the SEC. The indebtedness was too great for Buffets to withstand, and Buffets went

bankrupt.   But before the bankruptcy, Defendants successfully extracted hundreds of millions of dollars for themselves.   Defendants did not simply retrieve their original investment; they ensured themselves a substantial return.   Unfortunately, Buffets and its creditors did not fare as well, with many creditors receiving a very small fraction of what they were owed.

## The Sale-Leaseback Transactions

41.     During their control of Buffets, Defendants arranged several sale-leaseback transactions.  The first of these occurred as part of Defendants' buyout of Buffets when Buffets sold its headquarters in Eagan, Minnesota.   This was designed to lower Defendants' acquisition costs, but it left Buffets with one less asset and an expensive, long-term lease obligation that escalated each year from an initial annual rent of $1.85 million.

42.     In late 2001, Buffets completed a sale and leaseback transaction involving 24 restaurant properties for net proceeds of $39.1 million.  The long-term leases required an aggregate annual rent of approximately $4.2 million.  Shortly thereafter, as discussed more fully below, Buffets distributed $150 million in dividends.

43.     In December 2002, Buffets entered into a sale and leaseback transaction involving 27 restaurant properties for net proceeds of $22.6 million.   The long-term leases required an aggregate annual rent of approximately $3.2 million.  Caxton-Iseman received approximately $300,000 in "advisory fees" in connection with this transaction, and Buffets stated that it used proceeds from the sale and leaseback transaction to pay down long-term debt incurred as part of the 2002 dividend transaction described below.

-15-

44.     Buffets sold 3 additional properties for $3.5 million during the fourth quarter of 2003 and entered into a lease with annual rent of approximately $500,000.  In December 2003, Buffets sold another restaurant for $2.7 million and entered into a lease with an aggregate annual rent of $300,000.

45.     In connection with the Ryan's merger, as discussed more fully below, Buffets entered into a sale and leaseback transaction by which it sold 275 Ryan's restaurants and seven Buffets restaurants for $566.8 million.  Buffets entered into long-term lease agreements in connection with these properties.  Part of the cash generated in connection with the Ryan's merger was used to pay $17.8 million to Defendants for "transaction fees."

46.     Following the Ryan's merger, Buffets admitted in the risk disclosures of a December 2006 SEC filing that "[w]e have substantial operating lease obligations.  On a pro forma basis, we estimate that our operating lease obligations will be approximately $532.6 million for fiscal years 2007 through 2011."  Buffets further warned that "[w]e may not be able to generate sufficient cash flow to meet our debt service and operating lease obligations ...."  These substantial lease obligations, which were incurred to unjustly enrich Defendants, were part of the downfall of Buffets that ended in bankruptcy about a year after this disclosure was made.

**The Dividends Paid to Defendants (2002-2004)**

47.     The principal tactic, by measure of money received, that Defendants employed to enrich themselves were "dividend recapitalizations" in 2002 and 2004. Defendants attempted to justify these transactions by highlighting that they refinanced

-16-

Buffets' pre-existing debt. Except when touting their wares to investors (at which time they emphasized the sizable dividends received as a return on the equity investment in Buffets), Defendants downplayed the payment of dividends in Buffets' press releases by not disclosing the amounts and burying "distribution to all shareholders" in a lengthy list of things that would occur as a result of the transactions.

48.     The reality is that the principal purpose of these transactions was to pay huge dividends to Defendants by borrowing huge amounts of money that left Buffets insolvent and on a path to bankruptcy. As Buffets admitted in one of its SEC filings: "These distributions [the dividends paid from 2002-2004] were financed with indebtedness. We have no history of paying dividends out of our cash flow."

### A.     The 2002 Dividend Recapitalization

49.     On June 28, 2002, Buffets closed the 2002 dividend recapitalization that was commenced at Defendants' direction. To facilitate this transaction, Buffets used (1) $15.4 million of cash on hand, (2) $245 million from a $295 million senior secured credit facility, and (3) $221.2 million from the issuance of 11 1/4% senior subordinated notes, a total amount of $481.6 million. The 11 1/4% senior subordinated notes were issued at a discount of 96.181%, making the effective cost of this debt greater than the coupon percentage would suggest, particularly in view of the early redemption premium that Buffets eventually paid as part of the 2004 dividend recapitalization and the Ryan's merger.

50.     Buffets used these funds to (1) pay a $150 million dividend to the shareholders in Buffets Holdings, including Caxton-Iseman Investments, L.P. (which

-17-

then owned 76.86% of Buffets Holdings),[5] Sentinel LP (which then owned 6.92% of Buffets Holdings) and Hatlen (who then owned 5% of Buffets Holdings), (2) repay Buffets' former credit facility that was entered into as part of the Caxton-Iseman/Sentinel buyout ($216.2 million), (3) redeem the 14% senior subordinated notes issued as part of the Caxton-Iseman/Sentinel buyout ($82.7 million), (4) redeem the 16% senior subordinated notes of Buffets Holdings issued as part of the Caxton-Iseman/Sentinel buyout ($17.6 million), and (5) pay transaction fees and expenses ($15.1 million).

51.    By virtue of this $150 million dividend, setting aside the amounts received through the fee agreements and other transactions, Defendants received more than they invested in Buffets less than twenty months before.   Nothing in Buffets' financial performance since the buyout justified paying this dividend.

52.    As part of the 2002 transaction, Buffets Holdings issued $7.764 million of Series A senior subordinated notes to holders of senior preferred stock to make a partial redemption of that preferred stock.  Buffets Holdings also issued $20 million of Series B junior subordinated notes as a dividend to shareholders and holders of warrants to purchase common stock.  Caxton-Iseman, Sentinel, and Hatlen all held both the Series A and Series B notes issued by Buffets Holdings.

53.    Prior to the transaction, as of January 2, 2002, Buffets stated that it had approximately $306 million in long-term debt.  After the transaction, as of July 3, 2002,

---

[5] In certain SEC filings, Caxton-Iseman Capital, Inc. is listed as the contact for Caxton-Iseman Investments, L.P.  In others, Caxton-Iseman Capital, LLC is listed as the contact.  On information and belief, Caxton-Iseman Capital, Inc. and Caxton-Iseman Capital, LLC exercised control over Caxton-Iseman Investments, L.P.

Buffets stated that it had approximately $464 million in long-term debt, the difference from the prior number largely consisting of the $150 million dividend paid to Defendants and other shareholders. Buffets stated that the refinancing resulted in a loss of $38.5 million, $20.5 million of which was for prepayment redemption fees.

54.    Buffets' stated shareholder equity as of January 2, 2002, was $148.658 million. After the transaction, as of July 3, 2002, Buffets stated that it had a shareholder deficit of $6.785 million. Therefore, according to its own financials, the 2002 dividend recapitalization rendered Buffets insolvent. If the debt issued by Buffets Holdings as part of the transaction was taken into consideration, and without adjusting any number reported by Buffets, the shareholder deficit as of July 3, 2002 would have been $34.611 million (as was later reported in Buffets' SEC filings).

55.    Buffets' shareholder equity/deficit as of January 2, 2002 and July 3, 2002, was calculated using, among other things, a goodwill value of $312.163 million. As of January 2, 2002, Buffets had been amortizing its goodwill on a straight-line basis over a 15- to 30-year life, and Buffets had reduced its goodwill on its balance sheet from $325.5 million in October 2000 to $312.163 million in January 2002. However, on January 3, 2002, Buffets began applying new rules for accounting for goodwill and other intangible assets. As a result of the application of these rules, Buffets no longer amortized goodwill, and Buffets instead claimed to review the goodwill for impairments on an annual basis. From January 3, 2002 until Buffets went bankrupt, however, Buffets never recognized any impairment on the claimed amount of goodwill.

-19-

56.     After the 2002 dividend recapitalization, Buffets noted the problems that its

"substantial indebtedness" could cause:

> Our substantial indebtedness may limit our cash flow available to invest in
> the on-going needs of our business, which could prevent us from fulfilling
> our obligations under the [11 1/4% senior subordinated] notes. The degree
> to which we are leveraged could have important consequences, including:
>
> -   the impairment of our ability to obtain additional financing in
>     the future for working capital, capital expenditures, for,
>     among   other   items,   restaurant   development   and
>     refurbishment, acquisitions, general corporate purposes or
>     other purposes,
>
> -   a significant portion of our cash flow from operations must be
>     dedicated to the payment of principal and interest on our debt,
>     which reduces the funds available to us for our operations,
>
> -   some of our debt is, and will continue to be, at variable rates
>     of interest, which may result in higher interest expense in the
>     event of increases in interest rates, and
>
> -   our debt contains, and any refinancing of our debt likely will
>     contain, financial and restrictive covenants, the failure to
>     comply with which may result in an event of default which, if
>     not cured or waived, could have a material adverse effect on
>     us.

Perhaps most ominously, Buffets noted that "[d]espite our level of indebtedness, we will

be able to incur substantially more debt. This could further exacerbate the risks described

above." Incurring "substantially more debt" is precisely what Defendants caused Buffets

to do, and it ultimately bankrupted the company.

57.     In the same filing, Buffets noted that "[f]raudulent conveyance laws could

void our obligations under the [11 1/4% senior subordinated] notes." Buffets noted that

its incurrence of "substantial debt" could be reviewed under federal and state fraudulent

conveyance laws. Buffets noted that generally, "a company will be considered insolvent

-20-

for these purposes [fraudulent conveyance laws] if the sum of that company's debts is greater than the fair value of all of that company's property, or if the present fair salable value of all of that company's assets is less than the amount that will be required to pay its probable liability on its existing debts as they mature." Buffets concluded by saying "[w]e cannot determine in advance what standard a court would apply to determine whether we were 'insolvent' in connection with the sale of the notes." Buffets was insolvent in connection with the sale of the notes according to its own SEC filings.

**B.     The 2003 Dividend**

58.     Buffets paid approximately $400,000 in dividends during fiscal 2003. On information and belief, this was used by Buffets Holdings to repurchase $400,000 of Series B junior subordinated notes that were owned by Defendants and had been distributed as a dividend in the 2002 dividend recapitalization. As of July 2, 2003, Buffets reported a shareholder deficit for Buffets Holdings and its subsidiaries of $22.81 million. Buffets paid these dividends to Defendants at a time when Buffets was insolvent. During 2003, Buffets sold 13 Original Roadhouse Grill restaurants for approximately $30 million in gross proceeds. Buffets used the net cash proceeds ($24.5 million) to reduce its senior indebtedness that was incurred in the 2002 dividend recapitalization.

**C.     The 2004 Dividend Recapitalization**

59.     In 2004, Defendants caused Buffets to enter into a second dividend recapitalization. In January 2004, Buffets Holdings announced a proposed offering of senior discounted notes. Defendants originally hoped to enter into an amended senior

-21-

secured credit facility and issue these notes at the same time. Yet, two weeks later, Buffets Holdings announced cancellation of the offering of senior discount notes, which it attributed to market conditions. It announced, however, that Buffets, Inc. intended to go forward with the amendment of its credit facility. The 2004 dividend recapitalization therefore took place in two stages.

60.     On February 20, 2004, Buffets, Inc. entered into an amended and restated $310 million senior secured credit facility to "refinance existing debt and to make a distribution to Buffets Holdings." Buffet Holdings was owned by Caxton-Iseman Investments, L.P. (which then owned 78.5% of Buffets Holdings), Sentinel LP (which then owned 7.1% of Buffets Holdings) and Hatlen (who then owned 5.1% of Buffets Holdings).

61.     Buffets used $230 million from the amended and restated senior secured credit facility to (1) pay a $19.7 million dividend to Buffets Holdings (which was then distributed to the Defendant shareholders of Buffets Holdings), (2) refinance $166.8 million in outstanding indebtedness under the predecessor credit facility, (3) establish a $34.7 million restricted cash collateral account to repurchase outstanding 11 1/4% senior subordinated notes, (4) pay $2.7 million in transaction fees, (5) pay $1.1 million in accrued term loan interest and (6) use $5 million for "general corporate purposes." According to Buffets, the interest rate on the amended and restated credit facility was the same as under the previous credit facility.

62.     In February 2004, Buffets Holdings repurchased all outstanding Series A senior subordinated notes that were issued in 2002 in the principal amount of $7,764,219.

-22-

In February 2004, Buffets Holdings also repurchased $10.5 million of its Series B junior subordinated notes that were issued to shareholders of Buffets Holdings (including the Defendant shareholders) as a dividend in 2002.

63.     As of December 17, 2003, before entering the amended and restated credit facility, Buffets, Inc.'s stated shareholder equity was $12.438 million and long-term debt was $390.598 million. If the debt at Buffets Holdings had been included, and without adjusting any numbers reported by Buffets, Buffets would have had no equity and the shareholder deficit would have been approximately $15 million. As noted above, the shareholder deficit reported by Buffets as of July 2, 2003 for Buffets Holdings and its subsidiaries was $22.81 million.

64.     On April 4, 2004, after entering the amended and restated credit facility (but before the issuance of additional notes in May 2004), Buffets, Inc. reported a shareholder deficit of $7.849 million and long-term debt of $435.396 million. While some of the debt at Buffets Holdings was paid off in February, the addition of Buffets Holdings' outstanding debt, without adjusting any of Buffets' numbers, would have made the shareholder deficit approximately $16.5 million. Buffets paid these dividends while it was insolvent.

65.     In May 2004, Buffets conducted the second stage of the 2004 dividend recapitalization. On May 12, 2004, Buffets Holdings announced an offering of 13 7/8% senior discount notes. The proceeds of the offering were expected to be $75 million, which would be used to make a further cash distribution to shareholders, redeem the

1576373v1

remaining Series B junior subordinated notes that were issued as a dividend as part of the 2002 dividend recapitalization, and pay expenses and fees.

66.     On May 18, 2004, Buffets Holdings issued its 13 7/8% senior discount notes with a stated aggregate principal amount at maturity of $132 million.  The notes were issued at a discount of 56.873%, meaning the effective cost of this debt was far in excess of the coupon rate, especially because the notes were redeemed early as part of the Ryan's merger.

67.     Buffets Holdings received $75.1 million in gross proceeds from the note offering; it used that money and $100,000 of cash on hand to (1) pay a dividend of $60.9 million to its shareholders, including the Defendant shareholders of Buffets Holdings, (2) redeem the remaining Series B junior subordinated notes issued as a dividend in 2002 for $9.2 million, which was then distributed to the Defendant shareholders of Buffets Holdings, and (3) pay $5.1 million in transaction fees and expenses related to the offering.

68.     As explained above, on April 4, 2004, before the issuance of the notes in May 2004, Buffets, Inc. reported a shareholder deficit of $7.849 million and long-term debt of $435.396 million.  The addition of Buffets Holdings' outstanding debt as of that date, without adjusting any of Buffets' numbers, would have made the shareholder deficit approximately $16.5 million.

69.     On June 30, 2004, after the issuance of the May 2004 notes, Buffets Holdings and its subsidiaries reported a shareholder deficit of $75.916 million and long-term debt of $496.039 million.  The difference from April 2004 resulted from the notes

-24-

issued for the exclusive purpose of paying dividends to Defendants.  In total, Buffets Holdings paid $88.364 million in dividends during 2004, the vast majority of which went to the Defendant shareholders of Buffets Holdings.  These dividends were paid while Buffets was insolvent.

70.    In SEC filings relating to an exchange offering for the May 2004 notes, Buffets noted several risks associated with its "substantial debt service obligations" and warned that "[t]o the extent new debt is added to our currently anticipated debt levels, the substantial leverage risks described above would increase."  As discussed below, in November 2006, Defendants caused Buffets to incur more debt as part of the Ryan's merger, and the company went bankrupt a little over a year later.  In the SEC filings, Buffets disclosed that it may not be able to generate sufficient cash flow to meet its obligations and noted that "fraudulent conveyance laws could void our obligations under the notes."

71.    Buffets received no benefit from these dividend transactions.  To the contrary, Defendants placed Buffets under an unbearable weight of indebtedness and lease obligations to pay these exorbitant dividends to Defendants.

**Buffets' Other Activities During 2004 and 2005**

72.    On information and belief, during 2004 and 2005, Defendants attempted to unload debt-laden Buffets from their portfolios by putting it up for private sale or by trying to take it public.  Defendants were unsuccessful on both accounts.

-25-

73.     On July 28, 2005, Buffets entered into an amendment to its credit facility to relax the interest coverage ratio and the maximum leverage ratio requirements.  During 2005, Buffets maintained substantial long-term debt and substantial shareholder deficits.

74.     On December 29, 2005, Buffets Holdings entered into a contribution agreement with Caxton-Iseman Investments, L.P., Sentinel LP, Hatlen, members of Buffets Holdings' senior management, and Buffets Restaurant Holdings, Inc., by which the shareholders in Buffets Holdings contributed their shares to Buffets Restaurant Holdings, Inc. in exchange for proportional amounts of Buffets Restaurant Holdings, Inc. common stock.

**Buffets Merges with Ryan's**

75.     In January 2006, Buffets Holdings announced its plans to engage financial advisors "to assist in exploring strategic alternatives to maximize shareholder value." It later identified these advisors as Credit Suisse Securities (USA) LLC and Piper Jaffray & Co. By the end of the third quarter of 2006, Buffets Holdings' stated shareholder deficit was over $80 million.

76.     On July 24, 2006, under the control and direction of Defendants, Buffets, Inc. entered into an Agreement and Plan of Merger with Ryan's (the "Ryan's Merger Agreement").   The Ryan's Merger Agreement provided that each share of Ryan's common stock would be converted to the right to receive $16.25.  Buffets announced the merger the following day, valuing it at $876 million, including debt to be assumed or repaid at or prior to the closing.

77.     Even before the merger, Buffets was showing signs of increasing financial distress.  On July 31, 2006, the interest rate on Buffet Holdings' notes increased from 13 7/8% to 14 7/8% because Buffets Holdings did not satisfy a leverage ratio.   On September 13, 2006, Buffets entered into a second amendment to the credit facility relaxing the interest coverage ratio and the maximum leverage ratio.  As of September 20, 2006, Buffets Holdings had a shareholder deficit of $84.291 million.

78.     To consummate the merger as designed by Defendants, Buffets needed relief from restrictive covenants and events of default in the indentures for its existing notes.  Therefore, during September 2006, Buffets announced tender offers and consent solicitations for Buffets, Inc.'s 11 1/4% senior subordinated notes and Buffets Holdings' 13 7/8% senior discount notes.   Through the offer of substantial consideration to noteholders (at a significant cost to Buffets), Buffets obtained the requisite tenders and consents in October 2006.

79.     The merger transaction closed on November 1, 2006.  To finance the merger, Buffets incurred substantial new indebtedness and lease obligations.

80.     First, Buffets entered into a new $640 million credit facility, consisting of a $530 million senior secured term loan facility, a $40 million senior secured revolving credit facility, and a $70 million senior secured pre-funded synthetic letter of credit facility.

81.     Second, Buffets entered into a sale and leaseback transaction with Drawbridge Special Opportunities Fund LP or affiliates, an affiliate of Fortress Investment Group LLC, involving 275 Ryan's restaurants and seven Buffets restaurants.

-27-

The properties were sold for $566.8 million, and Buffets entered into long-term leases. Buffets estimated that its operating lease obligations for the first year under the sale and leaseback transaction would be approximately $57.5 million.

82.     Third, Buffets issued 12 1/2% senior notes for $300 million in proceeds. The notes were unsecured senior obligations of Buffets.

83.     To fund the Ryan's merger transaction, which required over $1.4 billion, Buffets used: (1) $530 million borrowed under the term loan portion of its new credit facility, (2) $5 million borrowed under the revolving portion of its new credit facility, (3) $566.8 million in proceeds from the sale and leaseback transaction, (4) $300 million in proceeds from the offering of the 12 1/2% senior notes, and (5) $9 million of cash on hand.

84.     Buffets used the $1.4108 billion obtained from the above sources of funds to: (1) pay $704.6 million in acquisition consideration to Ryan's shareholders, (2) repay $146.9 million of Ryan's existing indebtedness, (3) repay $196.4 million of Buffets' existing indebtedness under its previous credit facility, (4) repurchase or redeem Buffets, Inc.'s 11 1/4% senior subordinated notes for $195.3 million, (5) repurchase Buffets Holdings, Inc.'s 13 7/8% senior discount notes for $121.5 million, and (6) pay $46.1 million in transaction fees and expenses.  A significant part of the indebtedness that Buffets incurred as part of the merger was to eliminate existing indebtedness that Buffets incurred to benefit Defendants in earlier transactions, including payment of dividends and fees.

85.    On November 1, 2006, Buffets also borrowed approximately $70 million under the synthetic letter of credit facility.  After the closing of the transaction, Buffets paid approximately $31.2 million of additional transaction closing fees and expenses, including the $16.8 million fee paid to Caxton-Iseman under the Second Amended Caxton-Iseman Fee Agreement entered into on November 1, 2006.

86.    Prior to the closing of the Ryan's merger, as of September 20, 2006, Buffets had $463.934 million in long-term debt and a shareholder deficit of $84.291 million.  After the merger, as of December 13, 2006, Buffets had $826.025 million in long-term debt and a shareholder deficit of $119.227 million.  Buffets was insolvent before and after the Ryan's transaction.

87.    In addition to its massive long-term debt, Buffets had enormous lease payment obligations due to the sale and leaseback transactions arranged by Defendants. Buffets faced future minimum lease payments of $56.32 million in 2007, $112.175 million in 2008, $109.708 million in 2009, $104.212 million in 2010, $98.113 million in 2011, and $1,339,290,000 thereafter.  Buffets' total future minimum lease payment obligations aggregated to over $1.8 billion dollars.

**The Demise of Buffets**

88.    After the Ryan's merger, Buffets consistently reported losses.   In explaining the cause of the losses, Buffets repeatedly cited increased interest costs "primarily due to the significant increase in our long-term debt balances resulting from the debt we incurred in connection with the Ryan's merger on November 1, 2006." As of June 2007, Buffets reported a shareholder deficit of $188.539 million.

-29-

89.     As of September 19, 2007, Buffets reported a shareholder deficit of $192.724 million. In its 10Q filed on November 5, 2007, Buffets disclosed that it may breach the maximum leverage ratio covenant under the credit facility. It noted that it had initiated discussions with lenders to amend or waive the financial covenants. Buffets also announced that it hired another financial advisor, Houlihan, Lokey, Howard & Zukin Capital ("Houlihan"), "to review the business plan and advise the Company with respect to its capital structure."

90.     On January 3, 2008, Buffets, Inc. announced that it missed the January 2, 2008 interest payment of $18.75 million on its 12 1/2% senior notes and that it was exercising the 30-day grace period for the missed interest payment.

91.     On January 10, 2008, Buffets, Inc. announced that it had entered into a Forbearance Agreement and Second Amendment to its credit facility under which the lenders agreed to forbear from exercising rights in connection with anticipated defaults under the credit facility while Buffets, Inc. pursued a restructuring. Buffets announced to it had engaged another advisor, Kroll Zolfo Cooper LLC, to assist it and Houlihan in connection with cash-flow reporting and developing long-term capital restructuring alternatives.

92.     On January 11, 2008, Hatlen and Robert Rosenberg resigned from the board of Buffets Holdings and Buffets, Inc.   David Lobel, Sentinel's founder and managing partner, resigned from the boards of Buffets Holdings and Buffets, Inc., on January 18, 2008. As a result of his resignation, Buffets announced that the Sentinel Fee Agreement was terminated.

-30-

93.     On January 22, 2008, Buffets filed for bankruptcy.

94.     Although Defendants lost their equity interests in Buffets after reorganization, they had already bilked Buffets of hundreds of millions of dollars, far exceeding what they originally invested.  Buffets' transfers to Defendants, and the obligations incurred by Buffets for Defendants' benefit, occurred while Buffets was, or each transfer or obligation rendered Buffets, insolvent, undercapitalized, or unable to pay debts incurred as they became due.

95.     The actions Defendants took to obtain these transfers were extremely detrimental to Buffets and its unsecured creditors.  In contrast to Defendants' securing all of their investment and millions more, Buffets was left bankrupt, and Buffets' unsecured senior note holders and unsecured creditors recovered only a small fraction (estimated to be less than 5%) of what they were owed.

### IV.
### CAUSES OF ACTION

### COUNT 1
### Fraudulent Transfer (11 U.S.C. §§ 548(a)(1)(A) and 550)

96.     Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

97.     Buffets made transfers to or for the benefit of Defendants on or within two years of the Petition Date.  These transfers include (1) yearly management fees paid within two years of the Petition Date and (2) $17,800,000 in transaction fees paid in connection with the Ryan's merger in 2006.

98. These transfers were made by Buffets (at the behest and direction of Defendants) with the actual intent to hinder, delay and defraud some or all of Buffets' then existing or future creditors. These transfers constitute fraudulent transfers avoidable by Plaintiff pursuant to sections 548(a)(1)(A) of the Bankruptcy Code and are recoverable from Defendants pursuant to section 550(a).

99. Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from all initial transferees or the immediate or mediate transferees of such initial transferees, or the person for whose benefit the transfers were made, plus interest thereon to the date of payment and the costs of this action. Should additional transferees be discovered, Plaintiff reserves the right to amend its Complaint and name such transferees as Defendants in this action.

100. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment (a) avoiding and preserving each transfer to Defendants on or within two years of the Petition Date, (b) directing that those transfers be set aside, and (c) recovering those transfers, or the value thereof, from Defendants.

**COUNT 2**
**Fraudulent Transfer (11 U.S.C. §§ 548(a)(1)(B) and 550)**

101. Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

102. Buffets made transfers to or for the benefit of Defendants on or within two years of the Petition Date. These transfers include (1) yearly management fees paid

1576373v1

within two years of the Petition Date and (2) $17,800,000 in transaction fees paid in connection with the Ryan's merger in 2006.

103.   Buffets received less than a reasonably equivalent value in exchange for the transfers.  At the time the transfers were made, Buffets was insolvent or became insolvent as a result of such transfers.  At the time the transfers were made, Buffets (a) was engaged in a business or a transaction, or was about to engage in a business or transaction, for which the assets remaining with Buffets were unreasonably small in relation to the business or transaction and/or (b) intended to incur or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.  Buffets made transfers to Defendants as insiders under employment contracts and not in the ordinary course of business.

104.   The transfers constitute fraudulent transfers avoidable by Plaintiff pursuant to sections 548(a)(1)(B) of the Bankruptcy Code and are recoverable from Defendants pursuant to section 550(a).

105.   Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from all initial transferees or the immediate or mediate transferees of such initial transferees, or the person for whose benefit the transfers were made, plus interest thereon to the date of payment and the costs of this action.  Should additional transferees be discovered, Plaintiff reserves the right to amend its Complaint and name such transferees as Defendants in this action.

106.   As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment (a) avoiding and

-33-

preserving each transfer made to Defendants on or within two years of the Petition Date, (b) directing that those transfers be set aside, and (c) recovering those transfers, or the value thereof, from Defendants.

## COUNT 3
## Fraudulent Transfer (11 U.S.C. §§ 544(b), 550 and 551 and State Law)

107.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

108.   Buffets made transfers to or for the benefit of Defendants.  These transfers include: (1) $150,000,000 dividend in 2002, (2) $400,000 dividend in 2003, (3) $19,700,000 dividend in 2004, (4) $7,764,219 dividend in 2004, (5) $60,900,000 dividend in 2004, (6) between $15,179,000 and $17,379,000 in yearly management fees from 2002 to 2007, and (7) $17,800,000 in fees for the Ryan's merger in 2006.  The transfers at issue were fraudulent transfers under Minnesota state law, or alternatively, Delaware state law.  Buffets made the transfers at issue with the actual intent to hinder, delay, or defraud creditors of Buffets.  Additionally, Buffets did not receive reasonably equivalent value in exchange for the transfers to Defendants.  At the time the transfers were made, Buffets (a) was engaged in a business or a transaction, or was about to engage in a business or transaction, for which the assets remaining with Buffets were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured and/or (c) was insolvent or became insolvent as a result of the transfer.

1576373v1

109.    At all times relevant hereto, there existed one or more actual and/or future creditors of the Debtors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

110.    Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from all initial transferees or the immediate or mediate transferees of such initial transferees, or the person for whose benefit the transfers were made, plus interest thereon to the date of payment and the costs of this action.  Should additional transferees be discovered, Plaintiff reserves the right to amend its Complaint and name such transferees as Defendants in this action.

111.    Pursuant to sections 544(b), 550(a) and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment (a) avoiding and preserving each transfer made to Defendants, (b) directing that those transfers be set aside, and (c) recovering those transfers, or the value thereof, from Defendants.

### COUNT 4
### Avoidable Preference (11 U.S.C. §§ 547 and 550)

112.    Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

113.    Buffets made transfers to or for the benefit of Defendants in the year prior to the Petition Date.  These transfers include yearly management fees.  Buffets did not receive reasonably equivalent value in exchange for the transfers made to Defendants in the year prior to the Petition Date.  Defendants were insiders of Buffets at all relevant

-35-

times described herein.   Moreover, each transfer made to Defendants was to or for Defendants' own personal benefit.

114.   Each transfer made to Defendants in the year prior to the Petition Date was made on account of antecedent debt owed by Buffets before such transfer was made. Each transfer made to Defendants in the year prior to the Petition Date was made while Buffets was insolvent.

115.   Each transfer made to Defendants in the year prior to the Petition Date were made during the preference period under section 547(b)(4) of the Bankruptcy Code.  The transfers made to Defendants in the year prior to the Petition Date enabled Defendants to receive more than the Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

116.   The transfers made to Defendants in the year prior to the Petition Date constitute preferential transfers avoidable by Plaintiff pursuant to section 547(b) of the Bankruptcy Code and recoverable from the applicable Defendant pursuant to section 550(a).

117.   Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from all initial transferees or the immediate or mediate transferees of such initial transferees, or the person for whose benefit the transfers were made, plus interest thereon to the date of payment and the costs of this action.   Should additional transferees be

discovered, Plaintiff reserves the right to amend its Complaint and name such transferees as Defendants in this action.

118.   As a result of the foregoing, Plaintiff is entitled to a judgment pursuant to sections 547(b), 550 and 551 of the Bankruptcy Code and state law (a) avoiding and preserving the transfers made to Defendants in the year prior to the Petition Date, (b) directing that such transfers be set aside, and (c) recovering each of the transfers made to Defendants, or the value thereof, from Defendants.

**COUNT 5**
**Receipt Of Illegal Dividends (Del. Code Tit. 8, §§ 170, 173, 174)**

119.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

120.   Buffets made payments to or for the benefit of Defendants that constitute illegal dividends under Delaware General Corporation Law sections 170, 173, and 174. These illegal dividends include: (1) $150,000,000 dividend in 2002, (2) $400,000 dividend in 2003, (3) $19,700,000 dividend in 2004, (4) $7,764,219 dividend in 2004, (5) $60,900,000 dividend in 2004, (6) at least $15,179,000 in yearly management fees from 2002 to 2007, and (7) between $15,179,000 and $17,379,000 in fees for the Ryan's merger in 2006.

121.   These dividends were illegal when paid because Buffets Holdings did not have a surplus or net profits from which dividends could be lawfully paid. At the time the dividends were paid, Buffets Holdings' total liabilities exceeded its total assets. Defendants, as a result of their position as shareholders and advisors to Buffets, knew or

-37-

should have known that Buffets Holdings did not have a surplus or net profits from which dividends could be lawfully paid. Defendants nevertheless orchestrated the transactions by which these dividends were paid and received the dividends in bad faith.

122.    Defendants are liable for the transfers they received in violation of Delaware General Corporation Law sections 170, 173, and 174.

## COUNT 6
## Breach of Fiduciary Duty

123.    Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

124.    As agents for and advisors to Buffets, Defendants owed fiduciary duties to Buffets. As fiduciaries, Defendants owed duties of care and loyalty which obligated them to undertake a diligent and thorough analysis and provide competent financial, management and business strategy advice to Buffets. Defendants further owed the duty to act in the best interests of Buffets rather than themselves.

125.    Defendants breached their duties to Buffets by, among other things, misappropriating Buffets' funds and other benefits, failing to act in the best interest of Buffets, failing to disclose material information related to the transactions described herein, failing to secure appropriate financing, failing to properly assess the risks and benefits of the transactions described herein, failing to properly assess the risks and benefits of alternative structures for the transactions, failing to properly assess the probable impact of the transactions on the market, failing to properly assess the effect of

the transactions on Buffets' business operations, and failing to determine appropriate alternatives, if any.

126.   Defendants' actions caused significant damages to Buffets, including depriving it of assets, causing it to take on expensive leases, causing it to take on too much debt, causing it to pay dividends it could not afford and to which Defendants were not entitled, causing it to pay excessive fees to Defendants, and rendering it unable to pay its debts as they became due, leading ultimately to the failure of Buffets and necessitating Buffets' filing of a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

127.   As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.  Plaintiff is also entitled to fee forfeiture and disgorgement of profits obtained by Defendants.

## COUNT 7
### Professional Negligence/Gross Negligence

128.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

129.   As advisors to Buffets, Defendants owed Buffets duties of reasonable care that required Defendants to, among other things, undertake a diligent and thorough analysis of proposed transactions and provide competent financial and business strategy advice to Buffets.

1576373v1

130.   Defendants breached their duties to provide Buffets with competent advice related to the transactions described herein.   Moreover, Defendants were grossly negligent and acted with willful misconduct in the performance of their professional advisory services. Defendants' actions were intentional and fraudulent, were in disregard of the facts that were known, or should have been known, by Defendants, were in complete disregard of the consequences to Buffets, and demonstrate reckless indifference to the rights of Buffets.

131.   As a direct and proximate result of Defendants' professional negligence and gross negligence, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.  Plaintiff is also entitled to fee forfeiture and disgorgement of profits obtained by Defendants.

## COUNT 8
### Breach of Implied Covenant of Good Faith and Fair Dealing

132.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

133.   Defendants' fee agreements carried with them an implied covenant requiring Defendants to avoid conduct which would defeat Buffets' rights to receive the reasonably expected benefits of the agreements.  Buffets reasonably expected to receive the benefits of those agreements.

134.   Defendants breached the implied covenant of good faith and fair dealing by, among other things, failing to engage in reasonable due diligence and/or failing to act

-40-

1576373v1

in good faith towards Buffets when providing advice and management services to Buffets and carrying out the transactions described herein.

135.   Buffets reasonably expected that Defendants would act on behalf of Buffets, rather than themselves.  Defendants further breached the implied covenant of good faith and fair dealing by, among other things, utilizing Buffets so as to personally profit from Buffets' business and assets and by forcing Buffets into a series of one-sided fee agreements, knowing that Defendants' "advisory services" were harmful, unnecessary and/or never provided.

136.   Defendants' breaches were intentional, fraudulent, grossly negligent, and involved willful misconduct.  Defendants' breaches resulted in damages to Buffets.

137.   As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.  Plaintiff is also entitled to fee forfeiture and disgorgement of profits obtained by Defendants.

## COUNT 9
## Undue Influence

138.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

139.   Defendants were controlling shareholders of, or affiliated with controlling shareholders of, Buffets, and they appointed themselves as advisors to Buffets.  In these roles, Defendants mismanaged the company and stripped it of valuable assets to pay themselves unnecessary advisory and transaction fees and to obtain valuable dividends

-41-

Buffets could not afford.  When they undertook the transactions described herein, they interfered with Buffets' management and corporate governance rights though an unlawful course of conduct marked with deception and coercion.

140.   Buffets was unduly susceptible to the extraordinary pressure by Defendants - its advisors and dominant shareholders.  Defendants applied excessive pressure to induce Buffets (a) to pay unnecessary advisory and transaction fees to Defendants, (b) to enter into the fee agreements with Defendants, (c) to enter into the dividend recapitalizations, and (d) to enter into the Ryan's transaction and the sale and leaseback transactions.  Defendants' undue influence led Buffets to take the above corporate actions which were harmful to Buffets.

141.   These wrongful acts caused damages to Buffets.   Specifically, the transactions resulted in losses, lost profits, and the ultimate bankruptcy of Buffets. Moreover, Defendants received undue and unjust benefit to which Buffets is now entitled to recover.

142.   As a direct and proximate result of Defendants' undue influence, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.

## COUNT 10
### Unjust Enrichment

143.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

1576373v1

144.   As a result of the conduct described above, Defendants received ill-gotten and undeserved gains and were unjustly enriched of unlawful dividends and advisory fees and other compensation.   Defendants were aware that these benefits were obtained at the expense of Buffets; nonetheless, Defendants accepted and retained those benefits for themselves.

145.   Accordingly, Defendants should be ordered to account for and make restitution of and for the benefits they unjustly obtained.

146.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial.   Plaintiff is entitled to recover the reasonable value of the unjust benefits by Defendants.

**COUNT 11**
**Conspiracy to Breach Fiduciary Duties**

147.   Plaintiff repeats and realleges the allegations contained in all preceding paragraphs which are incorporated by reference as if set forth fully herein.

148.   Defendants, together with members of Buffets' board of directors and officers and other unknown persons, intentionally conspired to breach the fiduciary duties owed by the officers and directors of Buffets.   Buffets' directors and officers owed Buffets fiduciary duties of due care, good faith, and loyalty.   Additionally, because the transactions at issue occurred while Buffets was insolvent or in the vicinity or zone of insolvency, Buffets' directors and officers owed fiduciary duties of due care, good faith, and loyalty to Buffets' creditors.

-43-

149.   From the time of the Caxton-Iseman/Sentinel buyout until the bankruptcy filing in January 2008, Defendants had representatives on the board of directors that constituted a majority of the board such that Defendants exercised complete control over Buffets.   Acting in conspiracy with Defendants and knowingly in violation of their fiduciary duties, Buffets' board of directors and its officers (1) effectuated and authorized improper fee agreements that were designed to enrich Defendants without benefit to Buffets and (2) effectuated and authorized unlawful and improper transactions, including the sale and leaseback transactions, the dividend recapitalizations, the other dividend distributions, and the Ryan's merger, to enrich Defendants without benefit to Buffets.

150.   Defendants had actual knowledge of the breach of fiduciary duty and knowingly induced or participated in the breach.   Defendants knew that these transactions were improper or unlawful, would cause severe financial harm to Buffets, and were not in the best interests of Buffets.

151.   Defendants knowingly induced or participated in the breach in order that they might personally profit from these transactions.   Defendants acted with the specific intent to cause injury to Buffets and its creditors, which they knew would suffer severe financial harm as a result of the breach.

152.   Buffets suffered actual injury as a result of the foregoing.   Specifically, as a direct result of the actions described above, Buffets was unable make the payments on the high interest unsecured loans or its leases, and unable to pay its debts as they became due, resulting in losses, lost profits, and the ultimate bankruptcy of Buffets.

153. As a direct and proximate result of Defendants' conspiracy to breach fiduciary duties, Plaintiff has been damaged in an amount in excess of $75,000, the exact amount of which will be proven at trial. Plaintiff is also entitled to fee forfeiture and disgorgement of profits obtained by Defendants.

## V.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order:

1. Awarding judgment in favor of Plaintiff against Defendants;

2. Avoiding each of the transfers made to Defendants;

3. Granting recovery of all amounts transferred to Defendants;

4. Awarding all damages in favor of Plaintiff and against Defendants, jointly and severally, including fee forfeiture and disgorgement of profits;

5. Awarding exemplary damages in favor of Plaintiff and against Defendants in the highest amount allowed by law;

6. Awarding Plaintiff its costs, disbursements and attorneys' fees;

7. Awarding Plaintiff pre- and post-judgment interest; and

8. Granting such other and further relief, in law and in equity, to which Plaintiff may be entitled.

1576373v1

Dated: April 7, 2010

**Moss & Barnett**
**A Professional Association**

By: ___ s/ Kristin B. Heebner _____ .
       Thomas J. Shroyer (#100638)
       Kristin B. Heebner (#331235)
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 877-5000
Facsimile: (612) 877-5999

*OF COUNSEL*:
**BRACEWELL & GIULIANI LLP**

By: ___ s/ Ross D. Kennedy _____
       Ross D. Kennedy
       J. Clifford Gunter III
       Ralph D. McBride
       Bradley J. Benoit
       Kristin A. McLaurin
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 221-1236
Facsimile: (713) 437-5331

**ATTORNEYS FOR PLAINTIFF**

1576373v1